**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | |
| v. | CRIMINAL NO.: 22-474 (ADC) |
| [1] YARIEL PIÑEIRO-CASTRO, | |
| [5] SERGIO RODRÍGUEZ-RODRÍGUEZ, | |
| Defendants. | |

**REPORT & RECOMMENDATION**

## I.    INTRODUCTION

On July 13, 2023, a grand jury returned a superseding indictment against six individuals, including Mr. Yariel Piñeiro-Castro ("Mr. Piñeiro-Castro") and Mr. Sergio Rodríguez-Rodríguez ("Mr. Rodríguez") (both together, "Defendants"). ECF No. 67. As to Mr. Piñeiro-Castro, the superseding indictment charged him with use of interstate commerce facilities in the commission of murder-for-hire in violation of 18 U.S.C. § 1958, conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 846, possession with intent to distribute cocaine in violation of § 841(a)(1), (b)(1)(B)(ii), possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 67 at 1–4. Regarding Mr. Rodríguez, the superseding indictment charged him with conspiracy to possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii) and 846, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), and felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). ECF No. 67 at 2–5.

Pending before the court is Defendants' motion to suppress evidence, arguing that their arrests were unlawful, and anything seized afterward was fruit of the poisonous tree. ECF No. 155 at 1. In particular, Mr. Piñeiro-Castro seeks to suppress a Samsung cell phone that was recovered from his person following his arrest and its contents.[1] ECF No. 155 at 1. Likewise, Mr. Rodríguez seeks suppression as to an iPhone cell phone and identification cards that were recovered from his person following his arrest and the phone's contents. ECF No. 155 at 1. Additionally, Mr. Rodríguez requests that his statements made to arresting officers during his arrest be suppressed. Tr. 12.[2] A suppression hearing to address the issues was held on May 30, 2024.[3] ECF No. 273. For the foregoing reasons, Defendants' motion to suppress should be GRANTED.

## II.    FACTUAL BACKGROUND

Sometime between October 18, 2022, and November 1, 2022, the United States Postal Inspection Service (the "Inspection Service") became aware that Mr. Raúl Morales-Santiago ("Mr. Morales") was receiving death threats from Mr. Piñeiro-Castro, accusing Mr. Morales of stealing his cocaine.[4] *See* Tr. 54–56. Upon interviewing Mr. Morales, the Inspection Service learned that on October 18, 2022, Mr. Morales, Mr. Wilfredo Piñeiro-Castellano ("Mr. Piñeiro-Castellano"), and Mr. Emanuel Rivera-Figueroa ("Mr. Rivera") were involved in the packaging

---

[1] The motion to suppress also mentions statements made by Mr. Piñeiro-Castro. ECF No. 155 at 1. However, Mr. Piñeiro-Castro filed an additional motion to suppress concerning said statements that were addressed in a separate report and recommendation (ECF No. 272). Consequently, this report and recommendation will not address Mr. Piñeiro-Castro's request to suppress any statements.

[2] For the transcript of the suppression hearing held on May 30, 2024, see ECF No. 279.

[3] At the time of said hearing, Defendants' trial was scheduled to begin on June 3, 2024, two business days after the suppression hearing. ECF Nos. 145, 273. In light of the impending trial and because it was not viable to extend the suppression hearing into the following day, time limits for witness testimony were imposed during the suppression hearing.

[4] Any information addressing the Inspection Service's investigation before the November 1, 2022, arrests was supplied by the testimony of Postal Inspector Jose Ortiz Santiago. Defendants object to this testimony based on lack of foundation and hearsay. Those objections will be addressed in the analysis of this report; however, for purposes of completeness, this report will detail Postal Inspector Ortiz's account as provided by his testimony.

of three kilograms of cocaine in a parcel to be mailed. Tr. 56. Although Mr. Piñeiro-Castro had directed that said package be shipped to New York, Mr. Morales, by way of his own decision, chose to ship the cocaine to Philadelphia, Pennsylvania.[5] Tr. 56.

Mr. Morales further explained to the Inspection Service that because of his choice to disregard Mr. Piñeiro-Castro's directive, Mr. Piñeiro-Castro accused Mr. Morales of stealing his cocaine and told him that he owed him $75,000. Tr. 57–59. Mr. Piñeiro-Castro, by way of cellphone conversations, made threats to Mr. Morales stating that "I'm going to kill you, I'm going to erase your face." Tr. 57, ¶¶ 12–16. During the interview of Mr. Morales, the Inspection Service conducted a background check of the other individuals involved in packaging the cocaine. Tr. 58. Through these checks, the Inspection Service received information from Homeland Security Investigations ("HSI") that Mr. Rivera corroborated Mr. Morales's story. In other words, Mr. Rivera told HSI that he and Mr. Piñeiro-Castellano were involved in packing the three kilograms of cocaine alongside Mr. Morales. Tr. 58–59. However, neither Mr. Morales, Mr. Rivera, nor the Inspection Service's investigation generally, implicated Mr. Rodríguez. *See* Tr. 81–82.

Afterwards, Mr. Rivera started to cooperate with the Inspection Service's investigation. Tr. 59. He told the Inspection Service investigators (hereinafter, "postal inspectors") that Mr. Piñeiro-Castro had arranged a meeting on November 1, 2022, to discuss the recovery of money from Mr. Morales and how to proceed with said situation. *See* Tr. 59. The November 1, 2022, meeting was eventually confirmed to take place at Roland's Food Truck Park in Bayamón, Puerto Rico (hereinafter, "Roland's"). Tr. 59. At the hearing, a video recording without audio

---

[5] Two or three days after the cocaine was sent to Philadelphia but before Mr. Morales made contact with the Inspection Service, the Inspection Service learned that two individuals were arrested in connection with the shipment of cocaine. Tr. 56. Further, one of the two individuals confirmed that the three kilograms of cocaine were shipped from Puerto Rico. Tr. 56.

was admitted into evidence, capturing the meeting that took place at Roland's and Defendants' arrests thereafter. Exhibit 1.[6]

Mr. Piñeiro-Castro was the first of the "persons of interest" to arrive at Roland's on November 1, 2022.[7] Tr. 49–50, 61, 63–64. Mr. Rivera arrived thereafter wearing a key-fob-like device capable of recording audio provided by the Inspection Service. Tr. 62; *see also* Ch. 19 of Exhibit 1 at 8:15–30 (showing Mr. Rivera arriving). The recording device, however, did not provide a live feed to postal inspectors. Tr. 62. In other words, postal inspectors could not hear the conversations recorded by the device in real time before Defendants' arrests. Afterwards, Mr. Reymond Valentín-Vale ("Mr. Valentín"), Mr. Piñeiro-Castellano, and Mr. Rodríguez arrived at Roland's. Ch. 19 of Exhibit 1 at 43:55–44:45. While Mr. Valentín and Mr. Piñeiro-Castellano arrived together in a separate vehicle as Mr. Rodríguez, the three individuals essentially arrived at Roland at the same time. Tr. 35-36; *see also* Ch. 19 of Exhibit 1 at 43:55–44:45 (showing the three individuals arriving together and sitting at the table with Mr. Piñeiro-Castro and Mr. Rivera).

Undercover officers from both the Puerto Rico Police Bureau ("PRPB") and Inspection Service witnessed the meeting at Roland's. Tr. 64. However, the undercover agents could not hear the contents of the conversation at the meeting before the arrests were carried out. *See, e.g.*, Tr. 50 (undercover PRPB officer confirming she could not hear what the individuals meeting were discussing). Among the group of undercover agents, was PRPB Agent Xiomara Méndez ("Agent Méndez"), who testified at the suppression hearing. Ch. 26 of Exhibit 1 at 17:25

---

[6] The Government introduced Exhibit 1, which consists of four channels (Ch. 16, 19, 18, 19), capturing different video angles of security cameras Roland's.

[7] According to Inspector Ortiz, who was not present at Roland's on November 1, 2022, Mr. Piñeiro-Castro was seen with other people unknown to the investigation prior to the meeting on said date. *See* Tr. 63–64. For example, Channel 19 of the video recording shows Mr. Piñeiro-Castro (wearing a hat) meeting with an unidentified gentleman. Ch. 19 of Exhibit 1 at 0:00–8:00.

(showing Agent Méndez in a white t-shirt and blue jeans sitting alongside a fellow PRPB officer); Tr. 3, 5.[8]

During the meeting, Mr. Piñeiro-Castro, Mr. Valentín, Mr. Piñeiro-Castellano, Mr. Rivera, and Mr. Rodríguez can be seen, among other things, sitting at the same table, drinking, smoking, and talking. Ch. 19 of Exhibit 1 at 44:46–1:03:13; *see also* Tr. 62 (confirming that all five individuals were at the meeting). Around 11:38 p.m., the Inspection Service, through an unidentified individual, gave the signal to execute the arrests. Tr. 64; *see also* Ch. 19 of Exhibit 1 at 1:03:14 (moment the individuals notice presence of law enforcement time stamped at 11:38 p.m.). Consequently, the five individuals notice the presence of law enforcement closing in on Roland's. Ch. 19 of Exhibit 1 at 1:03:14; Tr. 39–40. Immediately thereafter, Mr. Piñeiro-Castro steps away from the table and walks quickly toward the restroom to which Mr. Piñeiro-Castellano follows. Ch. 19 of Exhibit 1 at 1:03; Ch. 26 of Exhibit 1 at 38:20. As Mr. Piñeiro-Castro shuffles swiftly toward the restroom, he places his hand around his right hip before he ultimately enters the men's restroom. Ch. 26 of Exhibit 1 at 38:20–23. Mr. Piñeiro-Castellano, on the other hand, stops at the entrance of the restroom, pulls out a firearm from underneath his clothing, and throws the weapon onto the restroom's roof. Ch. 26 of Exhibit 1 at 38:23–28; Tr. 40. As those events unfold, the remaining three individuals move away from the original meeting table. Upon returning from the restroom, Mr. Piñeiro-Castro sits alone at another table, and Mr. Rodríguez sits alongside Mr. Piñeiro-Castellano at another table. Ch. 26 of Exhibit 1 at 38:24–38:58; Ch. 18 of Exhibit 1 at 0:40–1:15.

As law enforcement officers entered Roland's without an arrest warrant, five officers surrounded Mr. Piñeiro-Castro, one of which had his weapon drawn and briefly pointed toward

---

[8] The United States called only two witnesses to testify at the suppression hearing. Agent Méndez was the only witness called to testify at the hearing that was actually present at Roland's during the events in question.

Mr. Piñeiro-Castro. Ch. 26 of Exhibit 1 at 39:07–22; Ch. 18 of Exhibit 1 at 1:25–40; *e.g.*, Tr. 73. Mr. Piñeiro-Castro was then ordered to the ground by officers who began conducting a pat down. Ch. 18 of Exhibit 1 at 1:25–2:00. While Mr. Piñeiro-Castro is on the ground, a female PRPB officer opens the men's restroom's door, where Mr. Piñeiro-Castro previously entered before being arrested, and looks inside for two seconds without entering. Ch. 26 of Exhibit 1 at 39:29. Thereafter, while still on the ground, Mr. Piñeiro-Castro is handcuffed by a PRPB officer with his hands behind his back. Ch. 18 of Exhibit 1 at 2:00; Tr. 80. Mr. Piñeiro-Castro is then eventually brought to his feet, and around this same time, the PRPB officers recover weapons from the men's restroom and its roof. Ch. 26 of Exhibit 1 at 40:20–40:46. Afterwards, officers surrounded Mr. Rodríguez and Mr. Piñeiro-Castellano and eventually arrested them. Ch. 18 of Exhibit 1 at 3:00–6:40. Following the arrests, officers seized a Samsung cell phone from Mr. Piñeiro-Castro and an iPhone cell phone from Mr. Rodríguez. Tr. 68.

## III.  ANALYSIS

Defendants contend that their warrantless arrests were made in violation of the Fourth Amendment because they occured without probable cause, and therefore anything seized thereafter must be excluded as fruit of the poisonous tree. ECF No. 155 at 4. Relying primarily on the collective knowledge doctrine, the United States of America (the "Government") responds that the arrests were lawful. ECF No. 175 at 2–5. The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Davis v. United States*, 564 U.S. 229, 234–35 (2011). Arrests are seizures under the Fourth Amendment, and thus must also be reasonable. *See Payton v. New York*, 445 U.S. 573, 585 (1980). An arrest is reasonable when it is "based on probable cause to believe that the individual has committed a crime." *Bailey v. United States*, 568 U.S. 186, 192 (2013)

(quotation omitted). In the absence of an arrest warrant, the Government bears the burden of establishing that probable cause existed at the time of the arrest. *See, e.g.*, *United States v. Valenzuela*, 365 F.3d 892, 902 (10th Cir. 2004).

The Government's theory to establish probable cause relies heavily on the investigation preceding Defendants' November 1, 2022, arrests. Indeed, the Government contends that the investigation paired with Mr. Piñeiro-Castro's attendance at Roland's on November 1, 2022, in and of itself, establishes probable cause to arrest Mr. Piñeiro-Castro. *See* Tr. 103, ¶¶ 6–8 ("As to [Mr.] Piñeiro[-Castro], the officers had probable cause to arrest him the day that they walked into [Roland's] in Bayam[ó]n."). Notwithstanding, the Government presented one witness to provide testimony regarding the investigation, Postal Inspector José Ortiz Santiago ("Inspector Ortiz"). Inspector Ortiz's testimony raised several arguments between the parties during the hearing. Consequently, before addressing the merits, this report will discuss the testimony of Inspector Ortiz.

### A. Whether Inspector Ortiz's testimony is reliable.

Defendants objected to Inspector Ortiz's testimony on the grounds that much of it constituted hearsay and lacked foundation. While "it is well-settled that hearsay testimony is admissible at suppression hearings," the weight assigned to hearsay testimony, if any, will depend on the court's assessment of its reliability. *United States v. Brown*, 621 F.2d 48, 54 n.5 (1st Cir. 2010) (citations and quotation marks omitted). Inspector Ortiz's testimony raises reasonable concerns. Although his testimony covered the investigation of Mr. Piñeiro-Castro leading up to the execution of the arrests on November 1, 2022, Inspector Ortiz had limited involvement in the Inspection Service's investigation and was not present during the arrests:

> Q. [Mr. Piñeiro-Castro's Defense Counsel] And you were not present at the scene of the arrest, were you[?]

A. [Inspector Ortiz] I was not.

Q. You were not present when Mr. . . . Morales was interviewed by your fellow postal inspectors, right?

A. I was present during the first interactions with [Mr. Morales] but I was not present during the day of the arrest operation.

Q. Okay. Your knowledge about what transpired during the date of the arrest is based on, as you indicated here, your review of reports and review of other evidence collected by other agents, right?

A. Correct except for the time when [Mr. Morales] came forward saying that [Mr. Piñeiro] wanted to kill him an showed us the cellphone conversations.

Q. That's the only part that you were present during this investigation prior to Mr. Pi[ñ]eiro's arrest, correct?

A. Correct.

Tr. 73, ¶¶ 18–25; Tr. 74, ¶¶ 1–9.

Furthermore, Inspector Ortiz admitted that much of his testimony was not based on his firsthand knowledge and instead based on the conversations he had with his colleagues, reports concerning the investigation, the video recording of the scene of arrest, and the transcript from the audio recording of the November 1, 2022, meeting provided to postal inspectors after the arrests. *See, e.*g., Tr. 70, ¶¶ 12–13 ("That is based on conversations I had with co-workers that were present during this operation."); Tr. 63, ¶¶ 12–15 ("I know it based on the transcriptions from the key f[o]b that we obtained and also looking at the close circuit television from the establishment we received."). Thus, defense counsels' objections regarding Inspector Ortiz's testimony having a lack of foundation are well-taken.

Moreover, although hearsay is admissible for the conduct of the suppression hearing, it was unclear from Inspector Ortiz's answers how many layers of hearsay were involved in his testimony. For example, it is unclear how many levels of hearsay are involved in Inspector

Ortiz's explanation regarding Mr. Rivera's cooperation with the inspection service—cooperation that corroborated Mr. Morales's story and directly led to the arrests at Roland's on November 1, 2022:

> Q. [Government Counsel] What did you do next in your investigation?
>
> A. [Inspector Ortiz] We did some background checks on the people that [Mr. Morales] mentioned such as [Mr. Rivera]. We identified him with a conversation with HSI. We contacted them and, through them, they were able to sit down with [Mr. Rivera]. . . . [Mr. Rivera] confirmed that he was present when they were packing kilos, [Mr. Morales] and [Mr. Piñeiro-Castro's] cousin later, identified as [Mr. Piñeiro-Castellano] after they sat down with him October 1st of 2022. . . . [Mr. Rivera] was basically cooperating in the investigation[,] and he told us there was a meeting happening on November 1[, 2022] and that [Mr. Piñeiro-Castro] was coordinating that meeting at a restaurant. . . .
>
> Q. Did [Mr. Rivera] say what was the purpose of the meeting?
>
> A. Yes, the purpose of the meeting was relevant to coming together to figure out a way because [Mr. Piñeiro-Castro] wanted that [Mr. Morales] to pay the money, so they wanted to make sure that he provided some of that money.

Tr. 58, ¶¶ 21–25; Tr. 59, ¶¶ 1–17. Considering that Inspector Ortiz conceded that he was not directly involved in interviewing Mr. Rivera, the testimony above suggests that there are multiple layers of hearsay involved. Even so, the precise number of hearsay layers cannot be identified based on Inspector Ortiz's testimony because he did not elaborate as to how the information from Mr. Rivera eventually reached him.

Similarly, Inspector Ortiz's testimony was plagued with generalized assertions, making it unclear of where he received his information from exactly or whether he had personal knowledge of what he was speaking to. *See, e.g.*, Tr. 56, ¶ 14 ("*We* discovered that two or three days later . . . (emphasis added)); Tr. 62, ¶¶ 10–13 ("*The Inspection Service* provided [Mr. Rivera] with a device, like a key f[o]b to record the meeting. From that, *we* obtained a transcription of all the conversations that took place during that meeting." (emphasis added)). Hence, Inspector Ortiz's

testimony's inability to put the court in a position to determine how many layers of hearsay are involved and repetitive use of the word "we" (i.e., speaking on behalf of the Inspection Service) makes it difficult for the court to assess the reliability of his testimony.

In sum, Inspector Ortiz's testimony leaves much to be desired and does not paint a clear picture as to who was aware of what regarding the investigation prior to the arrests on November 1, 2022, at Roland's. While Defendants requested that Inspector Ortiz's testimony be stricken (*E.g.*, Tr. 63), that is not necessary considering that said testimony becomes even more problematic when the Government relies on it to support its contention that the arresting officers had probable cause to arrest Defendants based on the collective knowledge doctrine.

**B. Whether the Government has shown that the probable cause existed at the time of the arrest based on the collective knowledge doctrine.**

The parties dispute whether the collective knowledge doctrine applies to establish probable cause. When "reviewing the existence of probable cause [courts] look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." *United States v. Balser*, 70 F.4th 613, 619 (1st Cir. 2023) (quoting *United States v. Azor*, 881 F.3d 1, 8 (1st Cir. 2017)) (internal quotations and alterations omitted). This is recognized as the collective knowledge doctrine.

There are two categories where the collective knowledge doctrine may apply: vertical and horizontal. *Id.* (citations omitted). "Vertical collective knowledge cases look like this: 'When a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, [courts] 'impute' to the arresting officer the directing officer's knowledge.'" *Id.* (citations and internal alterations omitted). Horizontal cases function differently. In such cases, courts pool or "aggregate information available to all the officers

involved in the investigation." *Id.* (quotation and internal alterations omitted). In other words, "a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." *Id.* (quoting *United States v. Chavez*, 534 F.3d 1338, 1345) (internal quotations omitted).

The Government asserts that both the vertical and horizontal doctrines apply to the instant facts. ECF No. 175 at 4. The Government, however, neither through its response in opposition (ECF No. 175 at 4) nor at the suppression hearing expands as to how the horizontal doctrine applies. Furthermore, the First Circuit has characterized the horizontal theory, compared to the vertical theory, as "more controversial" because other courts appear split on the issue, and the First Circuit has not addressed the "maximum reach" of said doctrine. *Balser*, 70 F.4th at 620. Thus, the Government has provided no reason for the court to navigate the "murky waters" surrounding the horizontal theory, especially when it failed to do so itself. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Notwithstanding, the horizontal theory is applicable when "no single officer possesses information sufficient for probable cause." *Balser*, 70 F.4th at 619. In essence, to rely on this theory, the Government would have to concede that no postal inspector nor PRPB agent—by themselves—had probable cause to execute the arrests. That is not the case here because according to the Government's contentions, the postal inspectors "had probable cause to arrest [Mr. Piñeiro-Castro] the day that they walked into" Roland's. Tr. 103, ¶¶ 6–8.

Consequently, the facts surrounding this case favor the vertical doctrine. *See* ECF No. 175 at 4 (The Government stating that the "facts at hand present the stronger case for vertical knowledge"). Indeed, the Government's argument regarding collective knowledge is focused on

an entity that had all the information to establish probable cause (specifically, as to Mr. Piñeiro-Castro), the Inspection Service, giving directives to an entity to execute the arrests that had limited knowledge, the PRPB. ECF No. 175 at 4; *see also* Tr. 102–103; *cf. Balser*, 70 F.4th at 620 ("[W]e conclude that Balser's case is best viewed as vertical, not horizontal, after homing in on the interaction between Turner and DiChiara—crucially, a fully clued-in Turner directed DiChiara to stop Balser."). Therefore, these facts fall within the vertical doctrine and therefore this report will focus on said doctrine.

The Government asks the court to impute the knowledge of the Inspection Service—that is, the investigation concerning Mr. Piñeiro—onto the PRPB officers who executed the arrests to establish that they had probable cause. To establish the vertical collective knowledge doctrine, the Government relies on the testimony of PRPB officer Agent Méndez and Inspector Ortiz. Courts addressing the vertical knowledge doctrine focus their analysis on the information the directing officer had to establish probable cause and the directives conveyed to the arresting officer. *See e.g.*, *Balser*, 70 F.4th at 621. Thus, it would not be a stretch to believe that Agent Méndez, as a PRPB officer, could provide some details as to the information PRPB officers received from the Inspection Service, specifically, the directives received by the arresting PRPB officers. Nevertheless, Agent Méndez's testimony does not shed much light as to what the arresting PRPB officers knew regarding the investigation or coordination that took place between the Inspection Service and the PRPB. Notably, Agent Méndez testified that she did not speak to the arresting PRPB officers or had knowledge of what the arresting PRPB officers knew or did not know about the Inspection Service's investigation. Tr. 47–48. Hence, Agent Méndez's testimony does little to nothing in linking the Inspection Service's or its investigation to the

arresting PRPB officers and thus does not further the Government's vertical knowledge contention.

Consequently, the Government relies almost entirely, if not solely, on the testimony of Inspector Ortiz—who had limited personal involvement in the investigation and was not present at the scene of the arrests—to discuss the investigation leading up to Defendants' arrests and the Inspection Service's viewpoint in executing the arrests. In relevant part, Inspector Ortiz testified that the PRPB, not postal inspectors, arrested Mr. Piñeiro-Castro and that the execution of the arrests began "after the signal was given . . . by the Inspection Service." Tr. 64, ¶¶ 21–22; Tr. 80. However, Inspector Ortiz does not have personal knowledge of that information because he was not present at Roland's on November 1, 2022. Tr. 73.

What raises further concern is that Inspector Ortiz's testimony fails to identify the individual from the Inspection Service that gave the signal or what he or she knew, the identity of the arresting officers or what they knew, or provide insight as to the directions that PRPB officers received from the Inspection Service, such as details of the investigation or the allegations against the persons of interest. The Government suggests that these details are not necessary, yet it fails to point to a case upholding the use of the vertical collective knowledge doctrine with such a scant record. *See* Tr. 102, ¶¶ 19–23 ("It does not matter that we don't know exactly which officer put handcuffs on exactly which defendant nor does [it] matter exactly which inspector postal agent gave that order . . . because of the nature of the collective [knowledge] doctrine"). To the contrary, cases imputing knowledge through the collective knowledge doctrine provide details connecting the directing entity with the executing entity, such as the identities of the directing officers and what they knew, the identities of the arresting officers and what they knew, or details regarding the coordination that took place between those

13

individuals. *See, e.g.*, *Balser*, 70 F.4th at 621–622 (discussing what information Turner, the directing officer, had to establish probable cause and Turner's directive to DiChiara, the arresting officer, to arrest the suspect because, among other things, he had ordered drugs and completed the purchase); *United States v. Meade*, 110 F.3d 190, 195–96, 198 (1st Cir. 1997) (detailing the information that Agent Newton, the directing officer, had to establish probable cause and his directive to Agent Fallon "to locate the brown car and arrest 'the third man' about whom descriptive communications had been exchanged that morning"); *United States v. Chavez*, 534 F.3d 1338, 1341, 1345 (10th Cir. 2008) (noting the basis of TFO Mowduk's probable cause and the details regarding his directive to Patrolman Chavez to conduct a traffic stop on the suspect).

Some courts have denied the imputation of knowledge based on the vertical theory when the Government failed to provide relevant details linking the directing officers to the arresting officers. In *United States v. De La Rosa-Calderón*, 511 F. Supp. 3d 1202 (D. Colo. 2021), Drug Enforcement Agency ("DEA") and local law enforcement officers planned and executed a search warrant on the residence of Pappas. *De La Rosa-Calderón*, 511 F. Supp. 3d at 1205. Prior to its execution, officers observed Pappas and another individual leave the Pappas residence in a Toyota vehicle. *Id.* As a result, DEA Agent Moham "stated on his radio that other law enforcement officers should follow the Toyota and, if they felt they had probable cause to conduct a stop of the vehicle, they could do so." *Id.* Agent Moham, however, did not know whether the Englewood Police Department ("EPD") was on his radio channel. *Id.*

Thereafter, Agent Moham and other officers entered the Pappas residence and found, among other things, handgun magazines and a bulletproof vest. *Id.* After exiting the residence, Agent Moham learned that Pappas was detained in a traffic stop. *Id.* As a result, Agent Moham sent another message over radio stating "that Pappas be brought back to the scene so we can

consolidate our resources and so [EPD] officers could go back about their patrol duties." *Id.* at 1205–06 (internal alterations omitted).

Sometime during the execution of the search warrant, EPD Officers Hume and Carreno observed the Toyota and stopped it after failing to properly use its turning signal. *Id.* at 1206. Prior to stopping the Toyota, Officers Hume and Carreno

> were informed that Pappas had a history of weapons convictions, but they did not know why the DEA was executing a search warrant on Pappas's residence that evening. . . . They were then informed that "a vehicle was leaving [Pappas's] residence and they wanted to be able to identify the occupants."

*Id.* Once the EDP officers stopped the Toyota, they asked Pappas and his passenger to exit the vehicle, and after "a bit of small talk," Officer Hume informed Officer Carreno that they were taking Pappas and the passenger into custody. *Id.* Pappas was then arrested and taken back to his residence. *Id.* According to Officer Carreno, she "believe[d] that 'Officer Hume communicated that information to [her] from the federal agents that were on the scene' at Pappa's residence." *Id.* (quotation omitted).

The United States District Court for the District of Colorado first found that Agent Moham did have probable cause to arrest Pappas, a prior felon, once he discovered the presence of "ammunition in plain view," among other things. *Id.* at 1209. Thus, the court's analysis next focused on whether Agent Moham's probable cause was imputed to Officers Hume and Carreno under the vertical collective knowledge doctrine. *Id.* In analyzing the testimony before it, the court ultimately concluded that the Government failed to produce evidence to support probable cause based on the vertical doctrine. *Id.* In reaching its conclusion the court highlighted Agent Moham's radio message "that Pappas be brought back to the scene"; however, it also focused on his other testimony where Agent Moham confirmed that he did not know whether the EPD was

listening and his lack of testimony confirming whether his message was received by the EPD.

*Id.*

Likewise, the court discussed Officer Carreno's testimony and the fact that Officer Hume did not testify:

> She testified that she believed that "Officer Hume communicated that information to her from the federal agents that were on the scene at Pappas's residence." . . . She did not testify that she heard the purported radio communication herself or that Officer Hume specifically informed her that they were instructed to bring Pappas back to his residence. Moreover, Officer Hume—the officer who purportedly heard Special Agent Moham's request and acted upon this request—did not testify at the evidentiary hearing.

*Id.* (internal alterations omitted). The court recognized that it was indeed a plausible inference that Officer Hume heard and acted upon Agent Moham's directive. *Id.* at 1210. However, without Officer Hume's testimony confirming he received the message or testimony confirming that EPD officers received Agent Moham's communication, that inference would effectively require the court to "take a leap of faith." *Id.* Accordingly, the court concluded that the testimony before it did not establish that the vertical doctrine applied and that "it is the Government alone which must bear the adverse consequences of Officer Hume's inability or unwillingness to testify before the Court on the issues presented here." *Id.*

The Court of Appeals of Ohio, in the context of a challenge under the Fourth Amendment to the United States Constitution, addressed a similar situation in *State v. Harrell*, 2024-Ohio-81. In *Harrell*, Detective Burch from the local drug investigation unit obtained a search warrant for Harrell's residence based on his investigation implicating Harrell in the sale of methamphetamines. *Harrell*, 2024-Ohio-81, at ¶¶ 16–17. After Harrell was observed leaving the residence, for reasons regarding officer safety, Detective Burch radioed assisting units to conduct a traffic stop on Harrell. *Id.* at ¶18. Officers Hayes and Rector, uniformed officers with the road

16

patrol, were assigned to stop Harrell once he left the residence. *Id.* at ¶ 19. Based on that assignment alone, Officers Hayes and Rector conducted a traffic stop on Harrell's vehicle. *Id.* The officers then detained Harrell, informing him that he was being detained in relation to a search warrant. *Id.* at ¶ 20.

On appeal, the State argued that the collective knowledge doctrine applied and that through it, Officers Hayes and Rector were aware of the facts that were contained in the search warrant.[9] *Id.* at ¶ 45. Thus, according to the State, Officers Hayes and Rector had reasonable suspicion, if not probable cause, to justify Harrell's detention. *Id.* The court disagreed, stating that "it is dubious whether the evidence adduced at the hearing" establishes the collective knowledge doctrine. *Id.* at ¶ 48. Particularly, the court acknowledged Detective Burch's order over the radio to initiate the traffic stop on Harrell but stated that the testimony failed to show who he had radioed or what he stated over the radio. *Id*. Moreover, Detective Burch's testimony failed to inform whether Officer Hayes and Rector received the message. *Id.*

The court also discussed the testimony of Officer Rector, the gaps within it, and the fact that Officer Hays did not testify:

> Officer Rector testified that she and her partner, Officer Hays, had been assigned to road patrol on the day the search warrant was executed. . . . She testified that they were notified that they were to assist on an investigation with the drug unit. She understood her assignment to be that, when Harrell left the residence, she was to conduct a traffic stop and detain him, which she did. . . . Officer Rector did not identify who contacted her to explain her role that day. Officer Rector did not testify that Detective Burch had directed her to conduct a traffic stop or even that she conducted a traffic stop based on hearing information over the radio. Officer Hays did not testify at the hearing.

---

[9] The appellate court deemed this argument waived because the State failed to raise it before the trial court. *Harrell*, 2024-Ohio-81, at ¶ 44. However, it further addressed the issue in dictum stating that "[e]ven if this argument were not waived, our conclusion would not change if we applied the collective knowledge doctrine to the facts of this case." *Id.* at ¶ 45.

*Id.* at ¶ 49. Notwithstanding the gaps in the testimony, the court conceded that "it is possible that

Officer Rector was instructed by Detective Burch to detain Harrell, or that she received and

reacted to a radio communication to stop Harrell." *Id.* at ¶ 50. However, the court held that the

State failed to meet its burden in establishing the collective knowledge doctrine because the

testimony before it did not foreclose alternate possibilities:

> [W]e cannot eliminate the alternative possibilities that Officers Rector and/or Hays
> were contacted by some other law enforcement officer who had no knowledge
> whatsoever of the basis for the search warrant or that Officer Rector observed
> Harrell leaving the apartment and performed a traffic stop because that was her
> assignment pursuant to the standard protocol of the police department to stop
> individuals who were leaving the location of a search warrant. It was incumbent
> upon the State to connect the communications between Detective Burch and the
> detaining officers to demonstrate that an officer who had knowledge of the basis
> for the reasonable articulable suspicion or probable cause actually transmitted the
> instruction to another officer, who received and then acted upon this instruction. . . .
> The State failed to present the necessary testimony at the suppression hearing to
> establish that the collective doctrine applied.

*Id.*

The testimony before the court in the instant action provides even less information to

establish the collective knowledge doctrine than the cases detailed above. Unlike in *De La Rosa-*

*Calderon* and *Harrell*, where the testimony identified the directing officer, arresting officers, and

provided some information as to the communications between them, the testimony here fails to

provide any of that information.[10] Thus, it follows that the facts before the court provide even

less of a basis to establish the collective knowledge doctrine.

In essence, the Government asks the court to take a leap of faith and infer from the

testimony of Inspector Ortiz—an officer who was not present at the arrest scene and had limited

personal knowledge of the investigation—that unidentified PRPB officers acted upon an

---

[10] Moreover, the prosecution in *De La Rosa-Calderon* and *Harrell* presented witness testimony from the directing officer and one of the arresting officers unlike here. Although Agent Méndez was at Roland's on November 1, 2022, she did not directly participate in the execution of the arrests.

unnamed individual's directive on behalf of the Inspection Service to arrest Defendants. This is indeed one plausible inference. Weighing against making this inference, however, is a lack of specific evidence, which courts traditionally analyze to establish the vertical collective knowledge doctrine, connecting the Inspection Service's investigation with the execution of the PRPB's arrests. Specifically, the Government's showing fails to explain (1) the identity of the postal inspector who gave the arrest signal, (2) what said inspector knew about the investigation upon giving the signal, (3) whether the signal was given to arrest Mr. Piñeiro-Castro only or all the individuals at the meeting, (4) the identities of the arresting officers or at least one of the arresting officers directly involved, (5) whether arresting officers received and acted in reliance of the signal, and (6) the explicit collaboration between the Inspection Service and the PRPB.

As previously alluded to, the vertical collective knowledge doctrine imputes a directing officer's knowledge—which alone is sufficient to establish probable cause—to an arresting officer who lacks the knowledge to establish probable cause. *Balser*, 70 F.4th at 619. Thus, critical in the inquiry is whether the directing officer (here, the postal inspector who gave the signal) had the knowledge to establish probable cause. However, the lack of specific evidence detailed casts a shadow of doubt as to whether the postal inspector who gave the arrest signal had enough knowledge about the investigation to support probable cause. Perhaps said postal inspector knew that Mr. Piñeiro-Castro threatened Mr. Morales, but did not know the purpose of the meeting at Roland's, a circumstance that would be problematic in particular as to the arrest of Mr. Rodríguez. Perhaps that postal inspector went to Roland's believing that they would only be conducting surveillance, a possible alternative considering that the Inspection Service did not secure an arrest warrant as to Mr. Piñeiro-Castro before the November 1, 2022, arrests. While the Government is not required to provide evidence regarding every single detail surrounding an

19

arrest, without further information addressing the directing postal inspector's knowledge establishing probable cause, this concern cannot be put to rest.

Based on the evidence adduced at the hearing, it is manifest that the vertical knowledge doctrine was not established here. Although it would be naive to ignore the fact that law enforcement agencies work closely together in executing arrests such as this one, the Government still has the burden to detail facts connecting the Inspection Service and the PRPB—something that was not done here. Consequently, to uphold the vital constitutional protections that the Fourth Amendment affords persons in Defendants' situation, it is the Government alone which must bear the adverse consequences of its choice to rely on a witness with limited personal knowledge surrounding the details of the case.[11]

A final note is in order. The time limits imposed during the hearing had no impact on the essence of the deficiencies in Inspector Ortiz's testimony. First, the Government requested 45 minutes to examine Inspector Ortiz and said request was granted in full. *See* Tr. 14, 52. Second, the Government did not use its full time to examine Inspector Ortiz. *See* H'rg, May 30, 2024, at 11:13–47 a.m. (Government examining Inspector Ortiz for approximately 34 minutes). Third, because the Government did not use its full 45 minutes, it was allowed to examine Inspector Ortiz on redirect. Tr. 87–88. Finally, more time would not have remedied the fact that Inspector Ortiz was not present at the arrest scene on November 1, 2022, and his lack of knowledge to many of the details. Thus, more time would have made no difference.[12] Accordingly, the

---

[11] In light of the fact that the Inspection Service's knowledge of the investigation cannot be imputed onto the PRPB arresting officers, it is not necessary to discuss whether the Inspection Service had probable cause to arrest Defendants solely based on the investigation. Having said that, it is undisputed that before November 1, 2022, the Inspection Service had no incriminating evidence or information about Mr. Rodríguez. *See* Tr. 81.

[12] Likewise, even if Agent Méndez had more time to testify, the Government could still not have established the collective knowledge doctrine because she categorically stated that she did not direct the officers who arrested Mr. Piñeiro-Castro nor had knowledge of what the arresting officers knew or did not know regarding the investigation. Tr. 47, ¶¶ 15–17, 20–23.

Government has failed in proving that probable cause existed at the time of Defendants' arrest based on the collective knowledge doctrine. Because the collective knowledge doctrine cannot be used to establish probable cause for Defendants' arrests, it will now be addressed whether the arresting officers on scene had probable cause to arrest Defendants based solely on the events of the day of the arrests.[13]

### C. Whether the arresting officers had probable cause to arrest Defendants based on their actions on November 1, 2022.

Defendants argue that nothing they did on November 1, 2022, established probable cause to justify their arrests. "[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been . . . committed and that the suspect is implicated in its commission." *United States v. Flores*, 888 F.3d 537, 543 (1st Cir. 2018) (quoting *Morelli v. Webster*, 552 F.3d 12, 21 (1st Cir. 2009)). "To determine whether an officer had probable cause to make an arrest, [a court must] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, (1996)). "[P]robable cause is not a creature of certainty and does not require either the level of proof needed to secure a

---

[13] At the inception of the suppression hearing, the Government explained its decision to call Inspector Ortiz to the witness stand:

> Let me alert the court of one matter, the witness that I intended to call, Inspector Sigfredo Mart[i]nez, is not the witness that I would like to call this morning. It's a different inspector, Jos[é] Ortiz, who is on the same team and would serve as a summary witness of the case, as I described in my response to their motion to suppress. I want to be very candid about the reason that I am not calling Inspector Mart[i]nez. We realized last night that we had not requested the transcript of Mr. Mart[i]nez's testimony from the original indictment in this case. He did not testify in the superseding indictment that is actually going to trial[,] but he did testify at the original indictment and it completely slipped my mind to request the transcript of that testimony. We are getting it expedited. I am hoping I will have it today but, of course, we are in a time crunch. So I intend to call a different inspector since I didn't get the transcript.

Tr. 13, ¶¶ 19–25; Tr. 14, ¶¶ 1–10.

conviction or even an 'unusually high degree of assurance.'" *United States v. Centeno-González*,

989 F.3d 36, 45 (1st Cir. 2021) (quoting *United States v. Clark*, 685 F.3d 72, 76 (1st Cir. 2012)).

Rather, an officer's conclusion that probable cause exists requires only objective reasonableness.

*Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 11 (1st Cir. 2004) (quoting *United States v.*

*Winchenbach*, 197 F.3d 548, 555–56 (1st Cir. 1999)).

> **1. Whether the arresting officers had probable cause to arrest Mr. Piñeiro-**
> **Castro.**

Mr. Piñeiro-Castro argues that he committed no crime on November 1, 2022, to establish

probable cause for his arrest. According to Inspector Ortiz, prior to the meeting, Mr. Piñeiro-

Castro spent his time at Roland's meeting with other persons, drinking, and counting cash. Tr.

64. By 11:20 p.m. on November 1, 2022, Mr. Piñeiro-Castro, along with Mr. Rivera,

Mr. Valentín, Mr. Piñeiro-Castellano, and Mr. Rodríguez, were meeting at Roland's. Ch. 19 of

Exhibit 1 at 45:10; Tr. 62.

The meeting between the five individuals lasted approximately 18 minutes. During this

time, the individuals can be seen, among other things, sitting at the same table, drinking,

smoking, and having conversations. Ch. 19 of Exhibit 1 at 44:46–1:03:13.[14] Around 11:38 p.m.,

the Inspection Service, through an unidentified individual, gave the signal to execute the arrests.

Tr. 64; *see also* Ch. 19 of Exhibit 1 at 1:03:14 (moment the individuals notice presence of law

enforcement time stamped at 11:38 p.m.). Consequently, the five individuals notice the presence

of law enforcement closing in on Roland's and begin dispersing from the original meeting table.

Ch. 19 of Exhibit 1 at 1:03:14; Tr. 39–40. Mr. Piñeiro-Castro steps away from the table and

---

[14] During this 18-minute timeframe, there is a brief period where Mr. Piñeiro-Castro and Mr. Rivera breakaway from the group and have a conversation. Ch. 19 of Exhibit 1 at 53:34. Mr. Rodríguez, Mr. Piñeiro-Castellano, and Mr. Valentín remain at the original table and, among other things, continue talking. Eventually, all five individuals return to the original table and continue having a conversation. Ch. 19 of Exhibit 1 at 58:30.

walks quickly toward the restroom to which Mr. Piñeiro-Castellano follows. Ch. 19 of Exhibit 1 at 1:03; Ch. 26 of Exhibit 1 at 38:20. As Mr. Piñeiro-Castro is shuffling swiftly toward the restroom, he places his hand around his right hip before he ultimately enters the men's restroom. Ch. 26 of Exhibit 1 at 38:20–23. Mr. Piñeiro-Castellano, on the other hand, stops at the entrance of the restroom, pulls out a firearm from underneath his clothing, throws the weapon onto the restroom's roof, and eventually walks to a different table. Ch. 26 of Exhibit 1 at 38:23–28; Ch. 19 of Exhibit 1 at 1:03:24–1:03:55; Tr. 40. Upon returning from the restroom, Mr. Piñeiro-Castro sits alone at another table, and Mr. Rodríguez sits alongside Mr. Piñeiro-Castellano at another table. Ch. 26 of Exhibit 1 at 38:24–38:58; Ch. 18 of Exhibit 1 at 0:40–1:15.

As law enforcement officers closed in on the meeting individuals' location, five officers surrounded Mr. Piñeiro-Castro, one of which had his weapon drawn and briefly pointed toward Mr. Piñeiro-Castro. Ch. 26 of Exhibit 1 at 39:07–22; Ch. 18 of Exhibit 1 at 1:25–40; *e.g*, Tr. 73. Mr. Piñeiro-Castro was then ordered to the ground by officers who then conducted a pat down. Ch. 18 of Exhibit 1 at 1:25–2:00. While Mr. Piñeiro-Castro is on the ground and initially being frisked by officers, a female PRPB officer opens the men's restroom's door, where Mr. Piñeiro-Castro had just came from, and without entering looks inside for approximately two seconds. Ch. 26 of Exhibit 1 at 39:29. Moments later, while still on the ground, Mr. Piñeiro-Castro is handcuffed by a PRPB officer with his hands behind his back. Ch. 18 of Exhibit 1 at 2:00; Tr. 80. Approximately 40 seconds later, Mr. Piñeiro-Castro is brought to his feet, and around this same time, PRPB officers recover weapons from the men's restroom and the restroom's roof.[15]

---

[15] Although the Government claimed that the weapon inside the men's restroom was recovered inside the toilet bowl, no testimony was introduced at the hearing to suggest where precisely in the restroom the weapon was recovered. Tr. 114, ¶ 2. Therefore, it is unknown whether the weapon inside the restroom was in plain view or concealed in say, for example, the toilet's water tank.

Ch. 26 of Exhibit 1 at 40:20–40:46. Following this encounter, officers also recovered a Samsung cell phone from Mr. Piñeiro-Castro's person. Tr. 68.

On the day of the arrest, the actions that raise suspicion about Mr. Piñeiro-Castro prior to being arrested were: (1) upon seeing law enforcement, he moved quickly to the restroom with his hand at his waist area and (2) the fact that another person at his table had a firearm. However, Mr. Piñeiro-Castro cannot be seen holding a weapon from the video recording. Nor did Agent Méndez testify that she saw Mr. Piñeiro-Castro in possession of a weapon prior to his arrest. Tr. 44–45. While law enforcement found a handgun in the restroom that Mr. Piñeiro-Castro entered shortly before his arrest, that weapon was recovered after five officers had initiated the intervention, ordered Mr. Piñeiro-Castro to the ground, conducted a pat down, and handcuffed him.[16] Thus, the discovery of the weapon cannot serve as a basis to establish probable cause for Mr. Piñeiro-Castro's arrest. Similarly, the fact that another person at Mr. Piñeiro-Castro's table had a firearm cannot be used to establish probable cause when there is no evidence indicating that Mr. Piñeiro-Castro was aware of the other person's weapon. Moreover, while Mr. Rivera wore a device that recorded audio of the meeting, that audio was not available to officers before the arrest.

---

[16] The Government could argue that the handgun in the restroom was found the moment the female PRPB officer opened the men's restroom without entering. Ch. 26 of Exhibit 1 at 39:28. This, in turn, would mean that the weapon was discovered before Mr. Piñeiro-Castro was handcuffed (but after he was surrounded by officers, ordered to the ground, and frisked). However, Agent Méndez's testimony does not clearly spell out when exactly the weapon in the restroom was discovered. *See* Tr. 40–41 (explaining the sequence of recovering the handgun). Moreover, without having a precise location as to where inside the restroom the weapon was found or whether it was concealed, it would be speculative to conclude that the PRPB officer could have found the weapon inside the restroom by merely looking from outside for only two seconds. Therefore, even though in *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) the First Circuit held that the horizontal collective knowledge doctrine applies where information is pooled from "officers present at the scene and directly involved in effectuating a stop," there is no pooling to be done when there is an absence of evidence as to what the PRPB officer that entered the bathroom knew at the moment that Mr. Piñeiro-Castro was handcuffed.

The Government contends that Mr. Piñeiro-Castro was temporarily detained in the moments before law enforcement discovered the weapon. Tr. 112. Unlike an arrest, a temporary detention "based on a reasonable suspicion that criminal activity may be afoot does not violate the Fourth Amendment, even in the absence of probable cause." *United States v. Pontoo*, 666 F.3d 20, 27 (1st Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 29-30 (1968)).[17] Thus, per the Government's contention, the discovery of the weapon can be used to establish probable cause that justified Mr. Piñeiro-Castro's arrest. As a preliminary matter, this argument is untenable because, per the Government's own witness, Inspector Ortiz, the signal to conduct the *arrests* occurred *before* Mr. Piñeiro-Castro moved quickly to the men's restroom. *See* Tr. 64–65. Thus, the Government cannot now argue that Mr. Piñeiro-Castro was temporarily detained before his arrest when law enforcement started executing his arrest before he had gone to the men's restroom. Notwithstanding, even if the court were to consider the Government's inconsistent contention, it would still not carry the day.

There is no bright line rule to distinguish between a temporary detention and an arrest. *See id.* at 30 (citing *Florida v. Royer*, 460 U.S. 491, 506–07 (1983)). Even more so, an encounter that begins as a temporary detention may morph into a de facto arrest based on the actions undertaken by law enforcement. *Id.* (citing *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003)). Thus, in considering the totality of the circumstances, a "court must determine whether [law enforcement's] initial action was justified and, if so, whether subsequent (more coercive) actions undertaken by the officer[s] were justified by developing circumstances." *Morelli v. Webster*, 552 F.3d 12 (1st Cir. 2009) (citing *United States v. Sowers*, 136 F.3d 24, 27 (1st Cir. 1998)). Temporary detentions "must be tailored to fit the exigencies of particular situations, and the mere

---

[17] Temporary detentions are commonly called *Terry* stops. *United States v. Rasberry*, 882 F.3d 241, 246 (1st Cir. 2018).

presence of arrest-like features is not fatal to the validity of a particular stop. The critical consideration is whether the arrest-like features can be reconciled with the limited nature of a" temporary detention. *Pontoo*, 666 F.3d at 30 (citing *United States v. Acosta–Colon*, 157 F.3d 9, 15 (1st Cir. 1998))

Officer safety remains a focal consideration in that inquiry. Law enforcement conducting a temporary detention are "entitled to take reasonable measures to protect their own safety and taking such measures does not transform a [temporary detention] into an arrest." *United States v. Jones*, 700 F.3d 615, 624 (1st Cir. 2012) (citations omitted). Courts have held that measures traditionally consistent with an arrest such as using handcuffs, drawing weapons, putting suspects on the ground, and the presence of multiple officers, in and of themselves, do not necessarily turn a temporary detention into a de facto arrest requiring probable cause. *See, e.g.*, *United States v. Chaney*, 647 F.3d 401, 409–10 (1st Cir. 2011) (finding that the use of handcuffs and the officer's drawn weapons did not transform temporary detention into de facto arrest because the suspect was arrested in tight quarters, resisted arrest, and had an extensive criminal history); *Pontoo*, 666 F.3d 20, 30–31 (1st Cir. 2011) (concluding that temporary detention did not convert to de facto arrest where a single officer drew his weapon, ordered suspect to the ground, and conducted a pat down because the arresting officer reasonably believed the suspect had committed a murder and thus was armed and dangerous); *United States v. Taylor*, 162 F.3d 12, 21 (1st Cir. 1998) (holding that no de facto arrest occurred when there were ten to twelve officers on the scene, at least one officer had a weapon drawn, and suspects were put to the ground and frisked because arresting officers were put on notice that suspects were armed and dangerous).

Context matters when analyzing a temporary detention and thus, the use of measures with recognizable indicia of a traditional arrest may be warranted when the evidence shows that officers had reason to justify said measures. This can be in the form of evidence demonstrating that the arresting officers had knowledge of the charges against the suspect or had reason to believe they were armed and dangerous. However, in this case, as described above, there is a dearth of evidence illuminating what the arresting officers knew at the time of the arrest. Agent Méndez's own testimony raises reasonable doubts about what she did or did not know about the investigation *at the time of the arrest*:

> A. We were giving support to the postal inspection division, the federal one.
>
> Q. Support for what?
>
> A. Regarding the investigation that they already had regarding some people that were going to kidnap somebody to kill them.
>        . . . .
> Q. But you said that [Mr. Piñeiro-Castro] was under investigation, I believe you said it was kidnap and murder, is that correct?
>
> A. Something that was going to be done.
>        . . . .
> Q. Before you came to the restaurant to do the surveillance that you already testified about, it is a fact that Mr. Sergio Rodr[í]guez was not the subject of any investigations by the postal inspectors, right?
>
> A. *We didn't know about the investigation that the fellow officers were conducting.*
>
> Q. So would it be right to say that you didn't have full information of whatever, specifically information that the postal officers had gathered up to that point, right?
>
> A. Correct.

Tr. 34, ¶¶ 2–7; Tr. 48, ¶¶ 9–11; Tr. 50, ¶¶ 19–25 (emphasis added); Tr. 51, ¶¶ 1–3. Although Agent Méndez's testimony regarding the investigation started with "some people" planning to kidnap somebody to kill them, she later states that the PRPB "didn't know about the investigation that the" Inspection Service was conducting. These inconsistencies raise doubts as

to whether Agent Méndez's knowledge of the investigation was obtained before the arrest. Moreover, nothing in Agent Méndez's testimony explains how she or other PRPB officers learned about the investigation before the arrests. Consequently, in light of the record before the court, it would be a stretch to infer Agent Méndez's knowledge of the investigation onto the arresting PRPB officers.

At the time of the arrest, Mr. Piñeiro-Castro was surrounded by five officers (one of which had his weapon drawn), ordered to the ground, and handcuffed, all before the weapon in the restroom was found.[18] Ch. 18 of Exhibit 1 at 1:25–2:50; Ch. 26 of Exhibit 1 at 39:12–40:50. Absent the information of the preceding investigation, which cannot be imputed on to the arresting officers per the analysis above, the Government fails "to identify specific facts or circumstances which could have led the [arresting PRPB] officers [to] reasonably . . . believe that the use of such measures was required to effectuate safely the" arrest.[19] *United States v. Acosta-Colon*, 157 F.3d 9, 21 (1st Cir. 1998). Given these circumstances, there is no choice but to conclude that the arresting officers' drawing of a weapon, ordering Mr. Piñeiro-Castro to the ground, and handcuffing him amounted to an unlawful arrest before the weapon in the men's restroom was found. Accordingly, his seizure was an unlawful arrest in violation of the Fourth Amendment.

---

[18] The video recording further shows that Mr. Piñeiro-Castro did not resist arrest. Ch. 18 of Exhibit 1 at 1:25–40.
[19] While an argument could be made that officers were justified in using arrest-like tactics in temporarily detaining Mr. Piñeiro-Castro because he was seen moving in parallel with Mr. Piñeiro-Castellano, who officers saw with a gun before the arrests, that contention is futile when taking into consideration the actions officers took in executing the arrests. Indeed, the video recording of Roland's shows officers immediately close in on Mr. Piñeiro-Castro, order him to the ground, frisk him, and handcuff him, all before Mr. Piñeiro-Castellano is arrested. Ch. 18 of Exhibit 1 at 1:30–6:30. Had the arresting officers been concerned about Mr. Piñeiro-Castellano because he was seen with a weapon, then arresting officers would have, at a minimum, arrested him simultaneously with Mr. Piñeiro-Castro. Thus, the video recording makes clear that the arresting officers did not rely on the fact that another person at Mr. Piñeiro-Castro's table had a weapon to justify the methods used in executing his arrest.

**2.  Whether the arresting officers had probable cause to arrest Mr. Rodríguez.**

Similarly, Mr. Rodríguez argues that his actions on November 1, 2022, fail to establish probable cause to justify his arrest. As mentioned, the five individuals dispersed from the original meeting table upon seeing law enforcement. Unlike Mr. Piñeiro-Castro or Mr. Piñeiro-Castellano, who can be seen moving quickly after noticing law enforcement, Mr. Rodríguez strolls slowly. Upon noticing law enforcement, Mr. Rodríguez stood in the close vicinity of the original meeting table for approximately 30 seconds and eventually slowly followed Mr. Piñeiro-Castellano to another table. Ch. 19 of Exhibit 1 at 1:03:15–1:04:00. During Mr. Piñeiro-Castro's arrest, Mr. Rodríguez and Mr. Piñeiro-Castellano were asked to raise their shirts by officers to which they complied. Ch. 18 of Exhibit 1 at 1:35–1:45. Officers remained in their general presence for approximately three minutes until they arrested both of them. Ch. 18 of Exhibit 1 at 1:35–4:40. Unlike the arrest of Mr. Piñeiro-Castro, the arrest of Mr. Rodríguez and Mr. Piñeiro-Castellano occurred after law enforcement retrieved the hidden weapons.

The video recording, in and of itself, fails to show Mr. Rodríguez conducting an illegal act while at Roland's on November 1, 2022. *See* Tr. 83–84 (Inspector Ortiz confirming that he did not see Mr. Rodríguez commit illegal activity). Furthermore, Agent Méndez testified that she did not see Mr. Rodríguez breaking the law while she was at Roland's in an undercover capacity. Tr. 50. The Government, however, argues that his presence at the meeting, active involvement thereof, and behavior after law enforcement arrived at Roland's—paired with the preceding investigation—shows that law enforcement had probable cause to arrest Mr. Rodríguez. Tr. 110–11. Notwithstanding, Mr. Rodríguez's actions on November 1, 2022, must be considered in isolation from the preceding investigation—which did not even acknowledge Mr. Rodríguez as a

person of interest—because the Government's collective knowledge theory fails.[20] None of Mr. Rodríguez's actions on November 1, 2022, when divorced of the prior investigation amounted to probable cause for his arrest. Accordingly, Mr. Rodríguez's arrest was unlawful in violation of the Fourth Amendment.

**D.  Whether the seized items are fruit of the poisonous tree.**

Defendants assert that the items seized and statements made following their arrests are fruit of the poisonous tree. ECF No. 155 at 7. "[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality." *New York v. Harris*, 495 U.S. 14, 19 (1990) (citation omitted). Or, put otherwise, "[t]he question whether evidence obtained after an illegal search should be suppressed" depends on whether "'the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Finucan*, 708 F.2d 838, 843 (1st Cir. 1983) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, (1963)). In this case, the evidence presented shows that law enforcement seized cell phones from each of the Defendants and that statements were made by Mr. Rodríguez shortly after the arrests. *See* Tr. 68.[21] Regardless, the seizure of these items and statements made were effectively contemporaneous with the arrest. Because there are no independent means distinguishing the making of the statements and seizure of the items from the illegal arrest, said

---

[20] Even when Mr. Rodríguez's actions are considered in tandem with the preceding investigation, without knowing what Mr. Rodríguez said at the meeting, it is not necessarily clear that law enforcement had probable cause for his arrest because he showed up to a meeting where illegal activities were to be discussed. *Cf. Robinson v. Cook*, 706 F.3d 25, 36 (1st Cir. 2013) (citing *United States v. Martínez–Molina*, 64 F.3d 719, 726 (1st Cir. 1995)) ("Mere proximity to a criminal act does not establish probable cause; the police must show some additional circumstances from which it is reasonable to infer participation in criminal activity.").
[21] No evidence was introduced at the hearing regarding Defendants' identification cards.

items and statements are fruit of the poisonous tree. Accordingly, it is recommended that these items and statements be suppressed.[22]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to suppress (ECF No. 155) should be GRANTED. Accordingly, Defendants' cell phones, the contents within those phones, identification cards, and Mr. Rodríguez's statements made after the arrest should be suppressed. The parties have fourteen (14) days to file any objections to this report and recommendation unless otherwise ordered by the court. Failure to file the same within the specified time waives the right to object to this report and recommendation. Fed. R. Civ. P. 72(b)(2); Fed. R. Civ. P. 6(c)(1)(B); D.P.R. Civ. R. 72(d); *see also* 28 U.S.C. § 636(b)(1); *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150–51 (1st Cir. 1994); *United States v. Valencia*, 792 F.2d 4 (1st Cir. 1986).

IT IS SO RECOMMENDED.

In San Juan, Puerto Rico, this 10th day of July, 2024.

s/Marcos E. López
U.S. Magistrate Judge

---

[22] The United States Supreme Court has held that

> [a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. . . . The exclusionary principle of *Wong Sun* and *Silverthorne Lumber Co.* delimits what proof the Government may offer against the accused at trial, closing the courtroom door to evidence secured by official lawlessness. Respondent is not himself a suppressible "fruit," and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt through the introduction of [untainted] evidence. . .

*United States v. Crews*, 445 U.S. 463, 474 (1980) (citations omitted). Mr. Piñeiro-Castro has not specifically moved to suppress the weapon found inside the restroom, which based on the evidence adduced at the suppression hearing, constitutes abandoned property.